through November 30, 2009, Ebenstein was involved in client assignments that generated total revenue of $57,403; he was paid salary and profit distributions totaling $146,000, again he same amount as Rosenthal. He failed to open a Consensus Mid-East office.

37. Following his return to New York, Ebenstein continued to work on the book. The Consensus shared computer calendar included frequent book-related entries reflecting, for example, particular days when Ebenstein would be in a library researching or writing the book, or scheduled office meetings to discuss the book.

**D. Consensus pays to promote the manuscript and to design a web site for the book.**

38. On information and belief, in late 2011, Ebenstein completed the book manuscript. The working title of the book was "Now I Get It: Repair Communication Breakdowns, Negotiate Successfully and Build Consensus . . . in Three Simple Steps." The manuscript relied largely on Consensus workshop curricula, including the Perspective Analysis three-part framework and workshop presentation materials copyrighted by Consensus. In addition, particular points in the manuscript were illustrated with case studies that were taken directly from the files of Consensus.

39. In or around late 2011, Michael Snell Literary Agency ("Snell Agency") agreed to present the book to publishers. Around the same time, Ebenstein reported to Rosenthal that the Snell Agency recommended that Consensus hire a book-marketing professional to help promote the book. Rosenthal consented, and he hired and met with a marketing professional to discuss the book promotion. Consensus paid the marketing professional's fees.

40. The marketing professional recommended that Consensus retain a web designer to create a web site design to demonstrate the book's commercial appeal.

12

Consensus retained a web designer and the Consensus staff worked on developing the content for the site. The site was intended to promote Consensus as well as the book. Consensus was invoiced and paid an $800 web designer fee.

41. The domain name for the web site would be based on the book's title – nowigetit.us. The nowigetit.us home page would feature a copy of the book cover, the Consensus logo, and a prominent link to Consensus' own web site. In addition, the web site would have a Workshops page, where visitors interested in more information on workshops, training or other services related to the book would be directed to a link to the Consensus web site. The web site also would feature a scrolling slideshow of client testimonials (all of whom were Consensus clients), the Consensus logo and a description of Consensus and its practices.

42. In September 2011, Rosenthal, Ebenstein and Metz together reviewed the web designer's draft of the site design and content. The web designer included a generic copyright notice at the bottom of the site. Rosenthal noted that Consensus should be listed as the copyright holder to ensure, among other things, that competitors would not reproduce or otherwise to try exploit the site and its information.

43. Ebenstein, however, wanted the site copyright to be in his name. He assured Rosenthal that he had no intention of leaving Consensus, and that in any event, he promised that the book and related web site would be used only to promote Consensus. Since the book had not yet been picked up by a publisher, and based on Ebenstein's representations and the trust Rosenthal reposed in Ebenstein, Rosenthal told Ebenstein he was willing to table the issue for the time being. Rosenthal explicitly reserved Consensus' claim that it owned the copyrights to the web site and book.

44. Ebenstein thereafter continued to lead Rosenthal to believe that the book and web site would, as he promised, be used to promote Consensus' business. For example, in a November 14, 2011 email to the web designer, Ebenstein conveyed final edits on the draft web site content, including an instruction to add, under a webpage headed Workshops: "If you are interested in training workshops, executive coaching, or other services relating to the book, please email inquiry@consensusgroup.com." The email address inquiry@consensusgroup.com was the same Consensus address listed on Consensus' web page for visitors interested in training, workshops and other services.

45. Ebenstein also wanted to insert on the Consensus web site a link to the book web site. He asked Rosenthal for the administrator passwords necessary to make changes to the Company's web site. Rosenthal gave Ebenstein the administrator passwords, and later noticed that Ebenstein had added a link to the book site in his biography webpage.

G. **Ebenstein quits working for Consensus -- but returns to disrupt Consensus' operations and client relations.**

46. On or about December 1, 2012, Ebenstein gave notice to Rosenthal and another Consensus executive employee that he was leaving Consensus as of the end of the year. In a subsequent email, Ebenstein confirmed that he did not see devoting time on a regular basis, if at all, to Consensus after December 31, 2012. He expressly wrote that he intended to pursue other business, including specifically leading workshops on his own.

47. Consensus deemed Ebenstein to have given notice of termination of employment. Particularly in light of Ebenstein's express statement that he intended to

lead workshops on his own, and in competition with Consensus, Rosenthal understood that Ebenstein's final day of employment would be December 31, 2013.

48. At the time of his notice of termination, Ebenstein was aware that he was scheduled to lead a series of workshops for a significant professional services client starting in January 2013. In his email, Ebenstein said he might be willing to assist Consensus these workshops, but if so, his compensation would have to be negotiated for each workshop. Ebenstein moreover warned that his willingness to participate in those workshops would depend on Rosenthal agreeing to terms for dissolution or a buy-out of Ebenstein's interest.

49. Rosenthal refused to agree to dissolution of Consensus. The Company would continue to be a profitable industry leader following Ebenstein's departure, and dissolution of the Company would needlessly destroy value that Rosenthal has built since 1993, and would cause unnecessary hardship to the Company's employees and clients.

50. Rosenthal attempted to negotiate a reasonable buy-out of Ebenstein's interest in order to minimize the adverse impact of a distracting dispute. Ebenstein, however, demanded a payout substantially in excess of any reasonable valuation of his member interest in the Company. Rosenthal refused to an exorbitant payout.

51. In a December 27, 2012 email, Ebenstein told Rosenthal that he "still do[es] not see myself doing workshops for Consensus after December 31." But since it appeared unlikely that he and Rosenthal would come to terms by year-end, Ebenstein decided that, "until further written notice, I will, after December 31, be engaged in the management of Consensus." He warned that his management plans included "doing things on a day-to-day basis that are similar in type (but not necessarily content) to what

15

you previously have done, including handling financial affairs" [emphasis added]. Ebenstein noted that, "among the things that I will be pursuing" would be to terminate the Company's office lease. Ebenstein in effect would be seeking to evict Rosenthal and his colleagues -- and the Company itself -- from their offices.

52. On information and belief, in an around December 2012, Ebenstein also informed Consensus clients that he would be leaving Consensus. On information and belief, he also told clients that he planned to lead workshops on his own. In at least some instances, Ebenstein's communications with Consensus' clients jeopardized the Company's relationships.

53. For example, in a January 9, 2013 email to a significant Consensus client, two weeks before the first in a series of Consensus-led workshops was scheduled to begin, Ebenstein reported to the client:

> I anticipate that, in the near future, I will be disposing of some or all of my 50% interest in Consensus and/or continuing a future affiliation with Consensus solely as a passive investor and/or engaging in a dissolution of the company. The other 50% owner of Consensus (Michael Rosenthal) has known since early December that my doing post-2012 workshops for Consensus was a remote possibility.

[emphasis added]. Ebenstein added that he is "a professional proud of his calling – "whether it be for Consensus or otherwise" – and that he would speak to his attorney and see if he could lead a workshop in the series, "without unduly affecting other issues that I have with [Rosenthal]" [emphasis added]. The client quickly contacted Rosenthal. She reminded Rosenthal that the long-scheduled series of workshops was important to the client, and she worried that Consensus would not remain in business long enough to

complete the workshop series. Rosenthal and Metz assured the client that Consensus was not in any jeopardy, and that it had a strong and effective professional staff in place to lead the workshops.

54. Rosenthal was concerned that further communications by Ebenstein relating to his departure from the Company would jeopardize the Company's relationships with its clients. Rosenthal had stopped staffing Ebenstein on client matters pursuant to his instructions, so there was no reason for Ebenstein to communicate with Consensus clients. Rosenthal therefore advised Ebenstein that, consistent with his instructions, he was not being staffed on client matters, and asked him to refrain from communicating with clients.

55. Ebenstein rejected Rosenthal's instruction to refrain from communicating with clients. In a January 14 email, Ebenstein told Rosenthal:

> I told you that my not doing those workshops did not alter the fact that, until further written notice, I will be engaged in the management of Consensus. Obviously, that includes monitoring Consensus's engagement of any staff or contractors, expenses related thereto, etc., as well as any communications that are had with workshop recipients about "other staffing". While I do not foreclose the possibility that I will be in touch with those workshop recipients about costs, revenues or other issues concerning the workshops, I have noted your preference that I not do so.
>
> I have told you before, and I tell you again: You do not control me, nor do you control how I think that Consensus should be run.